United States District Court
Southern District of Texas
**ENTERED**
January 04, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| VS. | § CRIMINAL ACTION NO. 4:22-cr-00028-1 |
| | § |
| BENJAMIN ROMERO-GONZALEZ | § |
| | § |
| Defendant. | § |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Benjamin Romero-Gonzalez's Amended Motion to Suppress. (Dkt. 29). Romero-Gonzalez, who is charged with illegal reentry into the United States in violation of 8 U.S.C. § 1326(a), seeks to suppress information that Romero-Gonzalez alleges was obtained in violation of his Fifth Amendment rights. The Government filed a response to the motion to suppress (Dkt. 30), and Romero-Gonzalez filed a reply (Dkt. 32). The Court conducted a suppression hearing on October 30, 2023. Defendant presented one witness, Officer Francisco Ramirez, who interviewed Romero-Gonzalez at the Harris County Sheriff's Office in 2018. Both parties presented oral arguments. After considering the motion, response, reply, evidence, and applicable law, the Court finds that Romero-Gonzalez's motion should be **DENIED**.

### I.     FACTUAL BACKGROUND

In April 2018, Romero-Gonzalez was arrested by the Houston Police Department for Failure to Stop and Give Information and Driving While Intoxicated (i.e., state-law crimes that have no elements connected to a defendant's immigration status). He was taken

1

to Harris County Sheriff's Office ("HCSO") for booking. While there on April 17, 2018, he was interviewed by Officer Francisco Ramirez, a deportation officer for United States Immigration and Customs Enforcement ("ICE") "working Enforcement and Removal Operations." Dkt. 30-1 at 1–2.

Ramirez provided an affidavit explaining that he is stationed at the ICE Houston Field Office at HCSO where he sees "about 5 to 15 individuals per day who are being booked into Harris County Jail on various criminal cases" and his "role is to determine 'alienage'" of individuals referred to ICE at HCSO. Dkt. 30-1 at 2. Suspected aliens are brought to a temporary holding area for an ICE officer to interview them to determine alienage and nationality. *Id.* at 1. To determine alienage, Ramirez states that he asks individuals "standard questions including name, citizenship, and about prior military service as part of the questions required to prepare an [ICE Form] I-213 document," which is titled Record of Deportable/Inadmissible Alien. *Id.* at 2. The individual would be fingerprinted, "the ICE officer would search the immigration and criminal databases to gather information related to the [individual], an immigration detainer would be placed on the [individual] determined to be an alien," and then individual would be returned to HCSO. *Id.* at 1–2. Per Ramirez, a detainer is "placed upon any subject who is determined to not have lawful status to be in the United States." *Id.* at 3.

Ramirez testified that he interviews non-citizens for the sole purpose of determining alienage to determine whether to put them under an immigration hold and therefore into immigration proceedings. He also testified that he does not assist in criminal prosecutions.

2

The government does not contest that Romero-Gonzalez was in custody when Ramirez interviewed Romero-Gonzalez and that Ramirez did not give Romero-Gonzalez *Miranda* warnings. Ramirez testified that HCSO provided him with Romero-Gonzalez's biographical information, fingerprints, and picture before the interview commenced. Ramirez then asked Romero-Gonzalez for information needed to fill out ICE Form I-213. The questions related to Romero-Gonzalez's identity and immigration status. Some of the specific questions Ramirez asked included the following: name, date of birth, citizenship, prior military service, country of birth, and date and manner of last entry into the United States. The completed ICE Form I-213 states that Romero-Gonzalez answered that, *inter alia*, he was not a citizen or national of the United States, he had never served in the United States military, he was a citizen of Mexico, and he had last entered the United States on or about May 2006 without being inspected by an immigration officer.

Ramirez placed an immigration detainer on Romero-Gonzalez. Romero-Gonzalez was deported in October 2018 pursuant to an immigration judge's order that Romero-Gonzalez be removed to Mexico. More than two years later, Romero-Gonzalez was found in the United States again in April 2021. He was thereafter indicted for reentering the United States in violation of 8 U.S.C. § 1326(a).

Romero-Gonzalez filed the pending motion to suppress the statements he made to Ramirez during the April 2018 interview.[1] He asserts that those statements were obtained

---

[1] In his initial motion to suppress, Romero-Gonzalez expressly sought to attack the validity of his 2018 deportation order. He insists that the pending amended motion to suppress is no longer a collateral attack on the earlier deportation order. (Dkt. 16 at p. 5; Dkt. 32 at 1–2). In any event, there is no evidence in the record that Romero-Gonzalez has satisfied the three prerequisites

3

in violation of his Fifth Amendment rights because the interview was a custodial interrogation, and he was not given *Miranda* warnings. He argues that Ramirez's questions did not fall into the "routine booking question" exception to *Miranda* as (1) the questions were asked after Attorney General Jeff Sessions had directed certain federal prosecutors, including those in the Southern District of Texas, to adopt a "zero-tolerance policy" for illegal entry offenses under 8 U.S.C. § 1325(a) by prosecuting all such offenses referred by DHS; and (2) some of the questions (e.g., immigration status, citizenship, date and manner of entry) were "intended to elicit incriminatory responses" as they sought information that "includes elements of prosecution for an illegal entry offense under 8 U.S.C. § 1325(a)." Dkt. 29 at 8; *see id.* at 9.

The government argues, *inter alia*, that the questions Ramirez asked were routine booking questions that did not require *Miranda* warnings and that Ramirez did not anticipate his questions could be reasonably likely to elicit an incriminating response. The government also argues that Romero-Gonzalez's statements should not be suppressed because Ramirez would have inevitably discovered this information when Ramirez verified the name and date of birth that HCSO had provided to him on various government databases.

## II. APPLICABLE LAW

The Fifth Amendment to the United States Constitution in relevant part states, "No person shall . . . be compelled in any criminal case to be a witness against himself." U.S.

---

required to collaterally attack his 2018 deportation order. *See* 8 U.S.C. § 1326(d) (listing the prerequisites).

Const. amend. V. In *Miranda v. Arizona*, the Supreme Court found that an individual's Fifth Amendment privilege against self-incrimination is "jeopardized" when he or she is in custody and subjected to interrogation. 384 U.S. 436, 478 (1966). Thus, the Supreme Court detailed the list of rights of which an individual in custody must be made aware: "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of any attorney, either retained or appointed." *Id*. at 479.

"Interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see id.* at 301–302 (explaining that "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response"). "[I]ntent of the police" "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 301 n.7.

However, "though the Fifth Amendment's protection against self-incrimination is not, as a general rule, governed by a reasonableness standard, the Court has held that questions ... reasonably related to the police's administrative concerns ... fall outside the protections of *Miranda* and the answers thereto need not be suppressed." *Maryland v. King*, 569 U.S. 435, 456 (2013) (internal quotation marks, brackets, and citation omitted)

5

(omissions in original). The "routine booking question" exception "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks omitted). "[Q]uestions designed to elicit incriminatory admissions are not covered under the routine booking question exception." *United States v. Virgen-Moreno*, 265 F.3d 276, 293–94 (5th Cir. 2001) (citing *Muniz*, 496 U.S. at 601 n.14). The "permissible booking questions include data such as a suspect's name, address, height, weight, eye color, date of birth and current age." *Presley v. City of Benbrook*, 4 F.3d 405, 408 (5th Cir. 1993).

### III. ANALYSIS

#### A. The Routine Booking Exception to *Miranda* Applies to Ramirez's Questions.

In this case Romero-Gonzalez's statements to Ramirez were in response to routine booking questions rather than an interrogation that would have required a *Miranda* warning. Accordingly, the statements are not subject to suppression.

The opinion in *United States v. Palacios*, 2017 WL 2378924 (S.D. Tex. May 31, 2017) presents nearly identical facts and arguments to the case at bar and is an instructive example of how the routine booking exception intersects with interviews conducted to complete ICE Form I-213. 2017 WL 2378924. There, Palacios was arrested for being a felon in possession of a weapon. *Id.* at *1. During the booking process at the Harris County Detention Center, defendant was interviewed by an Enforcement and Removal Operations officer who asked the defendant questions "about his identity and immigration status

6

needed to complete [ICE] Form I-213." *Id.* Palacios told the officer that he was born in Mexico, is a citizen of Mexico, had not served in the United States military, had been previously deported, did not fear returning to Mexico, and did not want his consulate notified. *Id.* Defendant was then indicted, in part, for illegal reentry in violation of 8 U.S.C. § 1326(a) and (b)(2). *Id.* He moved to suppress, among other things, all the statements he made to the officer. *Id.* The government did not contest that defendant was in custody during the interview and that the officer had not given him *Miranda* warnings, but it did argue that the officer merely questioned the defendant to determine if an immigration detainer was required and that the questions asked to complete ICE Form I-213 fell within the "routine booking question" exception. *Id.* at *2.

The court, noting that other courts have applied the "routine booking question" exception to *Miranda* where "the information sought from the defendant is primarily biographical and not intended to elicit incriminating responses," agreed with the government. *Id.* at *4–*5. In particular, the court noted, among other factors, that the officer interviewed the defendant solely for the purpose of completing Form I-213 to determine if an immigration detainer should be placed on the defendant, he had not been present at the time of the defendant's arrest, he was not involved in the criminal investigation of the defendant, and the defendant's arrest was based on firearm possession and was not related to his immigration status. *Id.* at *4.

The facts in this case track closely those in *Palacios*, and all the factors present in *Palacios* are also present here. Like the officer in *Palacios*, Ramirez testified that he interviews individuals for no other purpose than to determine if an immigration

7

hold/immigration detainer should be placed on them. He also was not present when Romero-Gonzalez was arrested (Romero-Gonzalez was arrested by HPD) and testified that he is not involved in criminal prosecutions. And Romero-Gonzalez's arrest was based on the offenses of Driving While Intoxicated and Failure to Stop and Give Information, both of which are not related to Romero-Gonzalez's immigration status.

Romero-Gonzalez acknowledges that "some Courts have ruled that statements made to a deportation officer in response to routine booking questions were not subject to Miranda warning[s] because they were in reference to administrative proceedings." Dkt. 29 at 7. However, Romero-Gonzalez argues that he "was interrogated when the zero-tolerance policy was in effect" and that the questions he was asked "included questions intended to elicit incriminatory responses" as the information sought "about his immigration status, his citizenship, and the date and manner of his entry into the United States" included "elements of prosecution for an illegal entry offense under 8 U.S.C. § 1325(a)." *Id.* at 8. More specifically, Romero-Gonzalez argues that if he had said he entered the United States undocumented "within 5 years of 2018, he could have been charged under 8 U.S.C. § 1325(a), according to the policy at the time." *Id.* at 9. Romero-Gonzalez also asserts that the zero-tolerance policy "commissioned every immigration officer, including Officer Ramirez, as a criminal investigator" and that prosecution of illegal entry "skyrocketed in 2018, in comparison with 2017." Dkt. 32 at 3. [2]

---

[2] To the extent that Romero-Gonzalez relies on the holding in *United States v. Arellano-Banuelos*, 912 F.3d 862 (5th Cir. 2019), to support this argument, this reliance is misplaced. In that case there was clear evidence that the questioning officer knew that his questions were going to elicit an incriminating response. In *Arellano-Banuelos*, among other things, the questioning officer already

8

The Court finds these arguments unpersuasive. The ICE Form I-213 at issue in *Palacios* contained the same questions regarding immigration status, citizenship, date and manner of entry into the United States, etc. as the ICE Form I-213 at issue in this case. *Compare* Dkts. 30-2 and 30-3 *with* Exhibits A and B to Government's Resp. to Def's Mot. to Suppress Evidence, *Palacios*, 2017 WL 2378924, ECF Nos. 21-1, 21-2. Romero-Gonzalez has provided no compelling argument as to how these questions, which Romero-Gonzalez acknowledges were found previously to be routine, booking questions, were somehow transformed in the instant case into questions intended to elicit incriminatory responses.

Furthermore, the "zero-tolerance" policy that Romero-Gonzalez references was an April 6, 2018 directive from the Attorney General to *federal prosecutors* not investigators along the Southwest Border to "adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)" "to the extent practicable, and in consultation with DHS." Dkt. 30-11; *see* Dkt. 34 at 1 ("Today's zero-tolerance policy further directs each U.S. Attorney's Office along the Southwest Border . . . to adopt a policy

---

had Arellano-Banuelos' file and knew at the time he conducted the interview that Arellano-Banuelos had been previously removed from the United States and was subject to an ICE detainer. *See Arellano-Banuelos*, 912 F.3d at 864, 867. By contrast, Ramirez encountered Romero-Gonzalez at HCSO because he was referred to ICE while HCSO was booking him for an offense unrelated to Romero-Gonzalez's immigration status, and there is no evidence that Ramirez knew anything about him before that encounter. Moreover, the *Arellano-Banuelos* panel expressly distinguished two out-of-circuit opinions on the basis that those two cases—like this case—"involved interviews with immigration officers that took place *before* the defendant illegally reentered the United States." *Id.* at 867 (emphasis in *Arellano-Banuelos*) ("The Second and Ninth Circuits therefore concluded that immigration officials had no reason to believe that the information they were gathering would incriminate the defendants in a later prosecution for illegal reentry."). There is, in short, no reason to conclude that *Arellano-Banuelos* conflicts with *Palacios*.

9

to prosecute all Department of Homeland Security referrals of section 1325(a) violations, to the extent practicable.").

To the extent that Romero-Gonzalez is claiming that this policy somehow changed routine, booking questions into questions intended to elicit incriminatory responses, the Court disagrees for several independent reasons. First, the policy was specifically directed to federal prosecutors along the southwest border (i.e., specific United States Attorneys' Offices). Romero-Gonzalez has not explained how a policy directed to United States Attorneys' Offices could be applicable to ICE, which agency employs Ramirez, much less how it could have "commissioned every immigration officer . . . as a criminal investigator." *See* Dkt. 32 at 3. Indeed, there is no evidence that Ramirez asked questions after the policy issued on April 6, 2018 that were in any way different from those he asked before the policy issued. Ramirez testified that he was in no way involved in prosecution decisions by the United States Attorney's Office nor did he assist in prosecutions.

Second, the current version of 8 U.S.C. § 1325(a) was enacted in 1996. Individuals can be charged under this section because it is the law, not because of any "policy at the time." *See* Dkt. 29 at 9. That "prosecution" of section 1325(a) offenses "skyrocketed in 2018, in comparison with 2017" is not evidence that Officer Ramirez's *questioning* deviated in any way from the routine, booking questions used to fill out ICE Form I-213; it just means that federal prosecutors were following a policy directive from the Attorney General *to prosecute* all referrals received from DHS.

Third, the argument that the questions asked of Romero-Gonzalez *could* have led to him providing an incriminating response that *could* have led to his prosecution under

10

section 1325(a) asks the Court to consider facts that are not present in this case. The fact is that Romero-Gonzalez did *not* say he had entered the United States within five years of 2018 and he was *not* prosecuted under section 1325(a), and the Court cannot engage in analyzing a doubly hypothetical situation not before it. *See United States v. Dougall*, 919 F.2d 932, 935 (5th Cir. 1990) (declining to depart from rule that biographical questions asked as part of the booking routine and not intended to elicit damaging statements are "not interrogation for fifth amendment purposes" where, among other things, the questioning "elicited no damaging statements").

### B. Ramirez Would Have Inevitably Discovered That Romero-Gonzalez Was an Alien in the United States Unlawfully.

Romero-Gonzalez's motion to suppress should also be denied on the grounds that Ramirez would have inevitably discovered that Romero-Gonzalez was an alien in the United States unlawfully.

The Supreme Court recognized the inevitable discovery exception in *Nix v. Williams*. 467 U.S. 431, 448 (1984). That is, when evidence "would inevitably have been discovered without reference to the police error or misconduct[] . . . the evidence is admissible." *Id.* The inevitable discovery doctrine applies where the government establishes, by a preponderance of the evidence, "(1) a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct and (2) that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991) (internal quotation marks omitted).

11

Here, HCSO provided Ramirez with Romero-Gonzalez's biographical information, fingerprints, and picture before the interview commenced. Ramirez could use that information to search immigration and criminal databases and gather information related to the individual being interviewed. Indeed, it was part of Ramirez's routine to search those databases. Thus, even if Ramirez had never interviewed Romero-Gonzalez, he would have discovered lawfully that Romero-Gonzalez was an alien in the United States unlawfully.

## CONCLUSION

For the reasons stated above, the Court finds that the statements Romero-Gonzalez made to Ramirez during the April 2018 interview should not be suppressed. Accordingly, Romero-Gonzalez's Amended Motion to Suppress (Dkt. 29) is **DENIED**.

SIGNED at Houston, Texas on January 4, 2024.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE